UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RICHARD N. BELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16-cv-01193-RLY-DLP |
| | ) | |
| MICHAEL MALONEY, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The court held a bench trial in this copyright infringement case on July 24, 2018.

Being duly advised, the court now enters its Findings of Fact and Conclusions of Law

pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. Background

1. Plaintiff, Richard Bell, is a licensed attorney and was an equity partner at the law

    firm of Cohen & Malad ("C&M") from 1984 to 2009.  (Tr. at 30; Bell Dep.[1] at

    4, 13).

2. As an equity partner, Bell's duties included practicing law and performing "such

    additional administrative services as may be required by the Firm from time to

---

[1] Defendant's Trial Exhibit 2 is the Summary of the Deposition of Richard N. Bell.  Portions of his actual deposition are found in Filing No. 40-1.  Rather than cite to the Summary Deposition, the court will cite his deposition.  For context, the court relied on Bell's Declaration (Filing No. 38-4) and to his sales records (Filing No. 38-2) which, like his deposition, are part of the summary judgment record.

1

time." (Def.'s Ex. 19 at 1-2). Bell's resume includes "sales and marketing" as one of his skills. (Def.'s Ex. 7).

3. Bell is also a "very serious" amateur photographer. (Tr. at 31). It was common knowledge at C&M that Bell's hobby was photography. (*Id.* at 21; *see also* Def.'s Ex. 38 at 12). His office walls were lined with photographs largely depicting landscapes from all over the country. (*Id.* at 15, 24).

4. On February 8, 2000, Bell signed a contract with West Publishing d/b/a LawOffice.com on behalf of C&M. (Def.'s Ex. 4; Bell Dep. at 52-53, 86).

5. Pursuant to this Contract, West agreed to develop and host an official website for C&M. (Def.'s Ex. 4). The goal was to generate business for the firm. (Bell Dep. at 73; Tr. at 115).

6. C&M paid West the sum of $8,400 annually to develop its website. (Tr. at 89). The cost was allocated to the partners of C&M pursuant to a complicated formula. (*Id.*).

7. Per the terms of the West Contract, a website development meeting between West and Bell was scheduled for February 19, 2000, with an alternate date of February 20. (Bell Dep. at 89). This call was held as scheduled as evidenced by a February 20 email from West's Marcus Anderson to Bell stating, "Great first call ... lots of info sent in while we were on the phone together…" (Def.'s Ex. 5 at 12).

8. Bell is also listed as the "Firm Contact" on the West Contract. (*Id.* at 3). The contact phone number listed for Bell on the Contract is C&M's main office

number, 317-636-6481, and the contact email address listed for Bell was his office email account, rbell@cohen&malad.com.  (Bell Dep. at 86).

9.  Although Tom Blackburn, an associate at C&M at the time, had the most technical knowledge relating to website design, C&M's partners preferred that a partner occupy the role of Firm Contact.  (Tr. at 18, 50, 52).

10. As C&M's Firm Contact, Bell performed the following tasks: (i) provided input as to the design and aesthetics of the website (Def.'s Ex. 5 at 12; (ii) managed photographic content (*id.* at 8, 10; implemented changes in the website (*id.* at 2, 3, 5, 6, 8, 10, 11, 12); and monitored and reviewed monthly web traffic reports provided by West (*id.* at 1, 3, 4).  With some exceptions, Bell generally served as the C&M representative with respect to all correspondence and communications with West.  (*Id.* generally).

11. All communications between Bell and West were sent to or from Bell's office e-mail account during normal business hours.  (*See id.*).

**B.    Terms of the West Contract**

12. Under the West Contract, C&M's contractual obligations included the following:

**LAW FIRM'S OBLIGATIONS**
**Delivery of Content to West.**
Law Firm will deliver to West in electronic form . . . the Content to be made available initially on Law Firm's FirmSite ("Initial Content") which will include Law Firm information, newsletters, marketing materials and the like, subject to the applicable Schedule attached hereto.  Law Firm will be responsible for obtaining all licenses and permissions required to provide and distribute the Content as contemplated hereunder.  From time to time during the terms of this Agreement, **Law Firm will provide West with updated or**

**additional Content** in electronic form and will identify and notify West of obsolete Content to be deleted from the FirmSite.

(Def.'s Ex. 4 at 1, ¶ 3.1).  "Content" is defined as:

**Content**.  "Content" means all textual, graphic, video and audio material provided by Law Firm to West under this Agreement for publication at Law Firm's FirmSite.

(*Id.* at 1, ¶ 2.2).

13. With respect to the ownership of the Content, the Contract provides in relevant

    part:

**OWNERSHIP**
The parties agree that, as between Law Firm and West . . . (ii) the Content is the exclusive property of Law Firm or its licensees.

(*Id.* at 2, ¶ 6).

### C.   Bell Takes the Indianapolis Photo

14. On Wednesday, March 8, 2000, West representative Jan Gudin sent an email to

    Bell which referenced a recent conversation between her and Bell.  (Def.'s Ex. 5

    at 12; Def.'s Ex. 33).  The email stated, among other things, that Bell "is also

    sending additional images for the homepage."  (Def.'s Ex. 2 at 12).

15. On the same day, March 8, at approximately 4:00 p.m., Bell testified he took a

    photograph of the downtown Indianapolis skyline from St. Clair Avenue at the

    canal bridge (the "Indianapolis Photo").  (Tr. at 39, 42, 43, 88; Def.'s Ex. 6 at 3-

    8; *see also* Filing No. 38-4, Declaration of Richard Bell ("Bell Decl.") ¶ 1).  The

    image is identified as "Indianapolis Skyline from Canal" in court documents.

    (Def.'s Ex. 6 at 3-6; Tr. at 88).

16. After taking the photo, Bell went home and edited the Indianapolis Photo using Photoshop.  (*Id.* at 34, 43).  He "took away the clouds that [he] didn't think were attractive."  (*Id.* at 39).

17. Bell returned to the North Canal location at about 9:00 p.m. to take another photograph.  (*Id*. at 45).

18. Generally, it takes Bell about a month to edit a particular photograph.  (*Id.* at 44-45).

19. Bell was not on Firm property when he took the Photo.  (*Id*. at 42).

20. Bell testified he used his own camera to take the Photo, but had difficulty identifying the type of camera he used at that time.  (*Id.* at 45, 71-73).

21. Senior C&M partner, Richard Malad, testified the Firm may have owned a camera in 2000, but he was not sure.  (*Id.* at 111 ("I don't know if we had it in 2000 and I don't know even if we have one now.")).

22. The Photo contains no metadata which would reflect the exact day, time, and type of camera Bell used.[2]  (*Id.* at 146).

### D.    The Idea to Use the Indianapolis Photo on the C&M Website

23. Someone from West proposed using various photographs of Indianapolis on the website to make the website more attractive.  (Bell Dep. at 99, 109).  Bell

---

[2] Jessica Wilch, Defendant's expert in photography and website design, testified that metadata is a picture's digital fingerprint, providing key information about the photograph, including the date and time the picture was taken, the speed setting, and the type of camera used. (Tr. at 146).  The only information Wilch could glean from the Photo was the file name, file size, and the date modified, May 18, 2014.  (*Id.* at 150-51).

rejected the idea of using generic stock photos because his photos were better

and free for C&M to use.  (*Id.* 114).  Bell also had discussions with West

personnel about including *his* photographs on the website.  (*Id.* 67 (testifying he

"took the photographs and delivered them to West")).

24. Blackburn asked Bell if the firm could use two of his photographs of the

Indianapolis skyline—one taken at night and one taken during the day (i.e., the

Indianapolis Photo)—on the C&M website.[3]  (*Id*. at 50-51).  Both Blackburn and

Bell claim the Indianapolis Photo was displayed, along with other photos, on his

office walls at the time.  (*Id.* at 15, 18, 51).

### E.    Bell Provides the Indianapolis Photo to C&M for the Website

25. Bell submitted approximately 50 photographs to the website committee, which

included Malad and C&M's Managing Partner, Irwin Levin, for selection

review.  (*Id*. at 54).

26. The use of the Indianapolis Photo on the [C&M] website was authorized by

"consensus of the equity shareholders and possibly other lawyers in the office

---

[3] Blackburn testified that the daytime and nighttime skyline photographs were "already in existence" before he (Blackburn) created the Firm's first website in the late 1990's. (Tr. at 24, 27).  He also was not sure which photograph was at issue in this case.  (*Id.* at 27).  Both the daytime and nighttime skyline photographs were registered with the Copyright Office, *see* Def.'s Ex. 1, and have been the subject of numerous lawsuits.  The court therefore concludes that the photographs he described are more likely than not the Indianapolis Photo at issue in this case and the nighttime photograph which was at issue in *Bell v. Taylor*, 827 F.3d 699 (7th Cir. 2016).  These photographs were uploaded to the C&M website in August 2000.  (Def's Ex. 5 at 12).  Because the events occurred some 18 years before his trial testimony, his imperfect memory is understandable.

who were asked to consult, that that'd be the best picture, and it was probably done in consultation with West as well."  (Def.'s Ex. 17 at 4).

27. There is no evidence that Bell was ever told or otherwise directed to take photographs by anyone at C&M for purposes of the C&M website.  (Tr. at 16, 110).

28. According to Malad, Bell's photography was never considered to be within the scope of his employment; the Firm did not need a photographer.  (*Id.* at 109).

**F.     The Indianapolis Photo Is Submitted and Uploaded**

29. On August 22, 2000, Bell submitted the Indianapolis Photo to West via his work email.  (Def.'s Ex. 5 at 12).

30. On September 1, 2000, West representative Michael Eckert sent Bell an email bearing the heading "Post Release Consultation" which stated: "Your requested changes have been posted to your site as follows."  (*Id.* at 11-12).  One of the "image changes" was the placement of the "Indianapolis Skyline from Canal" photo on the Practice Areas page.  (*Id.* at 12).  In all, ten images were sent by Bell to West during the August 17-22, 2000 time period.  (*Id.*).

31. The Indianapolis Photo was displayed on the C&M website for "approximately four or five years."  (Tr. at 49; *see also* Def.'s Ex. 5 at 11-12).

32. One of the photos selected by the website committee was from a photographer named Mark Hand.  Hand was given credit for his photograph of the Indiana War Memorial.  (Tr. at 55, 87; Def.'s Ex. 5 at 12).  No credit was ever given to Bell on the website for use of the Indianapolis Photo.  (Tr. at 88).

## G.    Ownership Rights

33. Bell and C&M never executed anything in writing pertaining to ownership rights of the Indianapolis Photo.  (Bell Dep. 86, 96, 102; Def.'s Ex. 17 at 4).

34. C&M never paid Bell for the Indianapolis Photo.  (Tr. at 133).

35. C&M has never claimed ownership of the Indianapolis Photo.  (*Id*. at 16, 109).

36. Blackburn testified it was "common knowledge" among the lawyers at C&M that Bell owned the Indianapolis Photo.  (*Id*. at 16, 19 ("It was common knowledge those [the photos] were [Bell's] photos and everybody was happy [Bell] let us use them."); *see also id*. at 16, 109-110).

## H.    Publication & Sales

37. Bell first published the Indianapolis Photo on August 29, 2000 on Webshots.com.  (*Id*. at 59; Bell Decl. ¶ 4).  He "always had a message on there that if you wish to license this photo, contact [him] by email."  (Tr. at 59).  In total, he sold three copies on Webshots to willing buyers for $200 a copy, the first of which was to Community Hospital in 2004.  (*Id.*).

38. In 2011, he published the Photo on his website, www.richbellphotos.com.  (Bell Decl. ¶ 5).  His first sale of record occurred on April 7, 2011.  (Filing No. 38-2, Sales Records).

39. Bell registered the Indianapolis Photo, along with 21 other photographs (including a photograph of the Indianapolis skyline taken at night), with the U.S. Copyright Office on August 4, 2011.  (Pl.'s Exs. A, B, C).

40. The U.S. Copyright attestation noted the Photographs "bear no identifying marks."  (Tr. at 38; Def.'s Ex. 1 at 1).

## I.      Maloney Forensics Downloads the Photo

41. Defendant, Michael Maloney, is a retired career federal law enforcement officer.  (Def.'s Ex. 40 ¶ 2; Tr. at 205-06).  He is presently semi-retired, living in the Kansas City, Missouri area.  (Def. Ex. 40 ¶ 2).  During his years of service, Maloney gained a level of expertise through education and experience in forensic investigations and has published two books on these topics.  (*Id.*).

42. Maloney currently provides occasional consultation, as well as training and seminars throughout the United States.  (*Id.*).  He has also written books on forensic investigations.  (Tr. at 189).

43. Maloney is the owner/operator of a website called MaloneyForensics.com.  This website was developed and conceptualized by his wife, Maxine Maloney, and published by Hostinista LLC, and launched on January 10, 2014.  (Def.'s Ex. 40 ¶ 4).

44. In early 2014, Maloney had scheduled a forensics seminar which was to have been held at the Kiwanis International Auditorium in Indianapolis, Indiana.  (*Id.* ¶ 5).  The dates of the seminar were March 4-6, 2014.  (*Id.*).

45. Marketing for this seminar was done through Maloney's website.  (*Id.* ¶ 6).

46. Maloney was assisted by Maxine with respect to the text and graphics that were used on the website.  (*Id.*).

47. Maxine has a background in computer programming and was instrumental in the layout design of Maloney's website to the extent that he lacks expertise in website construction.  (*Id.* ¶ 6; Def.'s Ex. 41 ¶ 2; Tr. 206-207).

48. Because Maxine is neither trained nor experienced in website design, she used the program iWeb by Apple to design Maloney's website.  (Def.'s Ex. 41 ¶ 2). The iWeb software is a plug-and-play system by Apple meant to allow anyone to design a website.  (*Id.*).  Maxine stated that she "chose basic color schemes, font style and wrote script for our various programs" and "chose photographs from those [she and Maloney owned] as well as from free websites to use on [the] webpage."  (*Id.*).  Maxine stated that when "Apple abandoned the iWeb platform," she provided their design to Hostinista to make their version web ready and to publish on the internet.  (*Id.*).

49. Maloney asked Maxine to locate a photographic image of the city of Indianapolis that could be used in marketing this event.  (Ex. 40 ¶ 7).  He instructed her to use only non-copyrighted images that were free to the public. (*Id.*).

50. On January 6, 2014, Maxine conducted an internet image search that resulted in her copying the Indianapolis Photo.  (Def.'s Ex. 41 ¶ 3).

51. She began her search by using the search terms "free photos of Indianapolis." (*Id.*).  While the Indianapolis Photo did not appear on the first page she viewed, it did appear on the second page as one of several photos when she clicked

"more images for free photos of Indianapolis."  (*Id.* ¶ 4).  Maxine eventually

clicked on the Indianapolis Photo, as shown below.



52. Underneath the above image, it reads: "Image may be subject to copyright."

Maxine testified she saw that warning.  (Tr. at 190).  But there was no

identification or copyright information either associated with the picture or

embedded as a watermark on the photograph.  There was no © symbol.  (Def.'s

Ex. 41 ¶ 7).  She then went to the two source pages designated under the

photograph, which contained no copyright information.  (*Id.*).

53. After visiting the two source pages, she downloaded the Indianapolis Photo to Apple Apperture where she checked the metadata for copyright ownership, name of photographer, etc. (*Id.* ¶ 8). No metadata was attached to the photograph so it attached the date it was downloaded. (*Id.*).

54. This is not the first time Maxine has checked to see if a photograph on the internet was subject to copyright protection. She has performed such checks for purposes of her husband's published books. (Tr. at 189). Based on her knowledge of the standards contained in those books, Maxine felt safe that her downloading of the Indianapolis Photo was non-infringing. (*Id.*).

55. Maloney believed that Maxine had exercised due diligence with respect to her downloading of the Indianapolis Photo; he did not have a concern that she might be violating any copyright laws. (*Id*. at 210).

56. According to Maloney, the Photo remained at all times on a work board between Maxine and Hostinista employee Chris Benefiel. (Tr. at 212-13). It was never viewable at MaloneyForensics.com. (*Id.* at 212).

57. Two people registered for the Indianapolis seminar. (Def.'s Ex. 40 ¶ 10). However, due to overall lack of enrollment in the seminar, it was canceled on February 12, 2014. (*Id.*; *see also* Tr. at 210).

**J.    Bell Discovers the Alleged Infringement**

58. In 2015, Bell discovered through Google images that Maloney had used the Indianapolis Photo without authorization. (Tr. at 65).

12

59. Maloney's first contact from Bell occurred on May 3, 2016, when he received an email from him demanding payment of $5,000 for "past unauthorized use" of the Indianapolis Photo.  (Def.'s Ex. 40 ¶ 12; Tr. at 124, 207).  Attached to the email was a copy of the Complaint he would file in four (4) business days if payment was not received.  (Def.'s Ex. 40 ¶ 12).

60. Maloney initially thought the communication from Bell was a scam and/or that it represented an extortion attempt.  (Tr. at 207).

61. Soon thereafter, the Indianapolis Photo "was taken off everything [Maloney and Maxine] had."  (*Id*. at 219).

62. Bell now seeks $10,000 against Maloney for copyright infringement.  (*Id*. at 67-68).

63. Bell testified he has filed approximately 70 lawsuits involving the Indianapolis Photo.  (*Id*. at 70).

## II.   CONCLUSIONS OF LAW

1. To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law.  To the extent any of the conclusions of law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

2. The court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and § 1338 (acts of Congress related to copyrights).

3. To establish copyright infringement, the plaintiff is required to establish two elements: "(1) ownership of a valid copyright; and (2) copying of constituent

elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 361 (1991).

4. Maloney does not dispute that the Indianapolis Photo was copied.  The disputed issue is whether Bell has a valid copyright over the Indianapolis Photo.

5. Under the Copyright Act, copyright ownership vests in the author of the work. 17 U.S.C. § 201.  The author of the work is typically "the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).  Under normal circumstances, a photographer is the author of his or her photographs. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992).

6. Bell published the Indianapolis Photo on the Firm website in August 2000.  He did not register the Photo with the Copyright Office until August 4, 2011.

7. A certificate of registration from the U.S. Register of Copyrights made within five years after the first publication of the work constitutes *prima facie* proof of copyright and gives rise to a rebuttable presumption of validity.  *JCW Inv., Inc. v. Novelty, Inc.*, 289 F.Supp.2d 1023, 1031 (N.D. Ill. 2003 (quoting *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994)). However, the evidentiary weight given the certificate of registration made thereafter is left to the discretion of the court.  17 U.S.C. § 410(c).[4]

---

[4] Section 410(c) of the Copyright Act provides:

14

8. Because Bell waited 11 years to register the Indianapolis Photo, the court finds that the presumption of validity is not applicable in this case.

### A.     Works Made for Hire

9. Works made for hire are "authored" by the hiring party, and the "initial owner of the copyright is not the creator of the work but the employer or the party that commissioned the work." *Glovaroma, Inc. v. Maljack Prods., Inc.*, 71 F.Supp.2d 846, 850 (N.D. Ill. 1999); *see also* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title.").  A work is properly classified as one made for hire under two circumstances, only one of which is relevant here.  If the work was "prepared by an employee within the scope of his or her employment," it is a work for hire.  17 U.S.C. § 101.

10. Bell concedes he was an employee of C&M at all relevant times.  Thus, whether the Indianapolis Photo was a "work made for hire" turns on whether Bell took the Indianapolis Photo within the scope of his employment.

11. Courts faced with this question generally apply the three-prong test in Restatement (Second) of Agency § 228 (1958).  *U.S. Auto Parts Network, Inc. v.*

---

In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

*Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th Cir. 2012) (citing *Avtec Sys., Inc. v.*

*Peiffer,* 21 F.3d 568, 571 (4th Cir. 1994));  *Shaul v. Cherry Valley–Springfield*

*Cent. Sch. Dist.,* 363 F.3d 177, 186 (2d Cir. 2004)).  Section 228 of the

Restatement (Second) provides:

> (1)   Conduct of a servant is within the scope of employment if, but only if:
>
> > (a)   it is of the kind he is employed to perform;
> > (b)   it occurs substantially within the authorized time and space limits; [and]
> > (c)   it is actuated, at least in part, by a purpose to serve the master . . . .
>
> (2)   Conduct of a servant is not within the scope of employment if it is different in kind  from  that authorized,  far  beyond  the authorized  time or space  limits,  or too little  actuated by a purpose to serve the master.

12. Maloney bears the burden to prove the defense.  *Urbont v. Sony Music Entm't*,

831 F.3d 80, 89 (2d Cir. 2016).

13. The court considers each element in turn.

### 1.    Elements 1(a) and (b)

14. To generate business and attract prospective clients, Bell was tasked to serve as

the Firm Contact with West, the company developing the C&M website.

15. In that role, Bell was contractually obligated to provide "Content" related to the

website.  Under the West Contract, "Content" includes "graphic materials (i.e.,

photographs).

16. Bell corresponded with West representatives about the website through his office email account during normal business hours.  They discussed photographs of Indianapolis on the website in general, as well as using Bell's photographs specifically.

17. Bell testified he took the Photo on a Wednesday at 4:00 p.m.—during the time he would normally be at work—but he was not on Firm property when he took it.

18. No one from C&M ever directed Bell to take any photographs for the C&M website.

19. It was common knowledge at the Firm that he owned the photographs he took, including the Indianapolis Photo.

20. The court therefore concludes that the taking of any photography for purposes of the website is not the kind of work Bell was employed to perform.

21. Whether he took the Photo during authorized time and space limits is a neutral factor and does not cut in favor of either party.

## 2.      Element (1)(c)

22. Bell took the Photo because he enjoyed landscape photography.

23. The Photo was uploaded to the Firm website to enhance its overall appearance.

24. Bell did not give himself credit for the Photo or grant the Firm a license to use the Photo.

25. The parties to the West Contract are West and the Firm.  Pursuant to paragraph 6 of the West Contract, the Content on the website is the exclusive property of the Firm or its licensees.[5]

26. Bell's Photo is "graphic" content within the meaning of paragraph 2.2 of the Contract.

27. "'Generally, only parties to a contract or those in privity with the parties have rights under the contract.'" *Deckard v. Gen. Motors Corp.*, 307 F.3d 556, 561 (7th Cir 2002) (quoting *OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1314-15 (Ind. 1996)).  The parties' intent "to bestow rights upon a third party 'must affirmatively appear from the language of the instrument when properly interpreted and construed.'"  *OEC-Diasonics*, 674 F.3d at 1315 (quoting *Freigy v. Gargaro Co.*, 60 N.E.2d 288, 291 (1945)).

28. Bell has filed approximately 70 copyright infringement cases over the Indianapolis Photo.  Neither C&M nor any of its partners, associates, or employees have ever asserted ownership in the Indianapolis Photo pursuant to the West Contract.  In fact, C&M attorneys testified at trial in Bell's favor.

29. The court finds neither Bell nor the Firm or its partners ever intended that the Firm *own* the Photo pursuant to the West Contract.

---

[5] Granting ownership rights to the Firm's licensees makes little sense, but there was never any testimony on the issue.  Instead, Bell testified he was the Firm's licensee.  If Bell owns the Photo and licensed it to the Firm, he would be the Firm's *licensor*.  The court believes the term "licensee" may have been a typographical error.

30. On these facts, the court questions whether Maloney has standing to assert the work-for-hire defense at all in this case.

31. As an initial matter, Maloney is not a party to the West Contract nor a third-party beneficiary under the Contract.  Thus, only the Firm may enforce its rights under the Contract, not Maloney.

32. Even if there were no contract, Maloney does not have standing to bring the work-for-hire defense under the facts of this case.  Two cases guide the court's analysis.

33. In *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, the Ninth Circuit explained that the purpose of the work-for-hire doctrine is "to establish ownership of a work as between a commissioning party or employer on the one hand and the commissioned party or employee on the other."  617 F.3d 1146, 1157 (9th Cir. 2010).  Thus, the court reasoned, a third party did not have standing under the work-for-hire doctrine where there was no dispute between the two potential owners (employer/employee) of the copyright, and both were plaintiffs in the action.  *Id.*  Although the Firm is not a party to this lawsuit, there is no dispute between the Firm and Bell over who owns the copyright in the Photo.

34. In *Urbont v. Sony Music Entm't*, cited by Maloney, the Second Circuit held just the opposite—a third party does have standing to assert the affirmative defense of work-for-hire.  831 F.3d 80, 88 (2d Cir. 2016).  The *Urbont* court distinguished *Jules* by noting that Urbont's employer "is not a party to the lawsuit and has not had the opportunity to clarify its position with respect to

19

ownership of the copyright." *Id.* at 87.  In the present case, the employer (Firm) is not a party to this lawsuit but has made its position with respect to the copyrighted Photo clear.

35. For these reasons, the court finds Maloney lacks standing to bring the work-for-hire defense.

36. Even if he had standing, the court finds he has failed to establish that the Indianapolis Photo was taken by Bell, as a work-for-hire, during his employment with C&M.

37. Maloney is therefore liable for copyright infringement.

**B.   Damages**

38. Pursuant to 17 U.S.C. (c)(1), Bell elects statutory damages of $10,000.

39. However, 17 U.S.C. § 504(c)(2) grants the court the power, in certain circumstances, to make a reduced award of $200:

> In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.

40. Maxine, on behalf of Maloney, downloaded the Indianapolis Photo.

41. Maloney asked Maxine to find only non-infringing pictures of Indianapolis to market his seminar.

42. Based on her research, Maxine did not believe the Photo was subject to copyright.  Neither did Maloney.

43. Maloney did not profit from the Photo; only two people registered for the seminar.  The Photo was never viewable from Maloney's website.

44. Maloney deleted the Photo from the work board that his wife shared with Hostinista.

45. Given these facts, the court finds Maloney sustained his burden of showing that he is an innocent infringer under § 504(c)(2) and awards Bell $200 in damages.

46. In addition, Bell seeks to enjoin Maloney from copying and republishing the Photo.

47. Maloney took the Photo down years ago.  There is nothing to enjoin.

48. Under 17 U.S.C. § 505, the court in its discretion may award costs and reasonable attorney's fees to the prevailing party.  Bell is entitled to his costs.

## III.    CONCLUSION

The court finds Maloney is liable for copyright infringement, but because he was unaware the Photo was entitled to copyright protection, Bell is entitled to damages totaling $200 and costs.  No injunction shall issue.

Bell is **ORDERED** to file a Bill of Costs by **June 24, 2019**.

The parties are **ORDERED** to file a brief regarding Bell's entitlement to attorney's fees.  Bell's brief is due on **June 24, 2019** and Maloney's is due on **July 15, 2019**.

**SO ORDERED** this 23rd day of May 2019.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.